# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| JOAN P. OSBORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 08 C 7395 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | Jeffrey T. Gilbert |
| of the Social Security Administration, | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the parties' cross- motions for summary judgment. Claimant Joan P. Osborn ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits. Claimant raises the following issues: 1) whether the administrative law judge improperly disregarded the testimony of the medical expert regarding Claimant's uncontrolled diabetes and its consequences; 2) whether the administrative law judge's hypothetical questions to the vocational expert were improperly based on an unsupported stand/sit option and did not take into account all of Claimant's limitations; and 3) whether the administrative law judge erred in discounting Claimant's credibility. For the following reasons, Claimant's motion for summary judgment is denied [20], and the Commissioner's cross-motion for summary judgment is granted [26].

## I. BACKGROUND FACTS

### A.    Procedural History

Claimant initially filed for Supplemental Security Income ("SSI") and Disability
Insurance Benefits ("DIB") on April 9, 2002, alleging a disability onset date of August 1, 2001.
R. 173. The Social Security Administration ("SSA") denied her application on July 11, 2002.
R. 87-90. Claimant then filed a request for reconsideration, which the SSA denied on September
20, 2002. R. 92-95. Shortly thereafter, Claimant requested a hearing before an ALJ. R. 96.

On March 1, 2005, Administrative Law Judge Helen Cropper ("ALJ") presided over a
hearing at which Claimant appeared with her attorney, Edward Grossman. R. 445-532.
Claimant and Julie Bose, a vocational expert, testified at the hearing. No medical expert
testified. On July 11, 2005, the ALJ rendered a decision finding Claimant was not disabled
under the Social Security Act. R. 68-86. Specifically, the ALJ found Claimant had the "residual
functional capacity to perform and sustain a wide range of simple, repetitive unskilled sedentary
work" and that "there are a significant number of jobs in the national economy that she could
perform." R. 86.

Claimant filed for review of the ALJ's decision to the Appeals Council on August 23,
2005. R. 140-41. On September 8, 2006, the Appeals Council granted the request for review
and remanded the case to the ALJ. R. 150-154. ALJ Cropper presided over the second hearing
on May 15, 2007, at which Claimant appeared with her attorney, Robert Kielian. R. 533-612.
Claimant testified at the hearing, along with Dr. Sheldon Slodki, a medical expert, and Michelle
Peters, a vocational expert. On May 25, 2007, the ALJ rendered a decision finding Claimant
disabled beginning on February 6, 2007. R. 14-45. Specifically, the ALJ found that Claimant
"was not disabled prior to February 6, 2007," but that "beginning on the date the claimant's age

category changed, considering claimant's age, education, work experience, and [residual functional capacity], a finding of 'disabled' is reached by direct application of Medical-Vocational Rule 201.14." R. 44.

Claimant filed for review of the ALJ's partially favorable decision to the Appeals Council. R. 13. On October 24, 2008, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. R. 7-9. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

## B.    Hearing Testimony – May 15, 2007

### 1.    Joan Osborn – Claimant

At the time of the hearing, Claimant was 50 years old, divorced, and living with her brother. Claimant completed education through the 12th grade and had past relevant work experience as a dental assistant and secretary. R. 462-63, 467. In addition to assisting with patients, Claimant's prior work experience included laboratory work, reception work, billing, and other clerical tasks. R. 467-470. Claimant had not worked since August 1, 2001, her alleged disability onset date. R. 463.

Claimant testified that pain in her back and knee, as well as neuropathy in her fingers and toes, prevented her from working. R. 550. Additionally, Claimant explained that she suffers from headaches and constant pain in her ankles, left shoulder, and neck. R. 567. Claimant stated that walking aggravates her ankle and knee pain, sitting aggravates her back pain, and stretching and lifting aggravate her shoulder pain. R. 569-71. Claimant stated she does exercises to help alleviate the pain, but the pain is "always there." R. 571. Claimant takes Aleve for the pain, but claimed it does not provide relief. R. 569. Claimant also takes insulin twice a day for diabetes mellitus. R. 583. Claimant testified that her emotions cause her blood sugar level to fluctuate.

*Id.* Claimant stated that when her blood sugar fluctuates, she becomes dizzy, starts to sweat, and gets the shakes; and when her blood sugar count is 200 or higher, her vision becomes blurry, which had occurred three or four times in the past month. R. 584-85. Claimant takes her own blood sugar readings with a glucometer. R. 585. Claimant reported that her readings fluctuate, with readings ranging from 40 to 500, and that she adjusts her insulin depending on the readings. R. 585-86. Claimant also testified that she suffers from panic attacks, but she cannot discuss her pain or panic attacks with her doctors because it is difficult to find a consistent doctor with her medical card. R. 559.

Claimant does not know how much she can lift, but testified that she cannot lift her 11-month-old grandson. R. 575. Claimant testified that she is able to stand for about ten minutes before becoming uncomfortable. R. 576. Claimant stated she is able to walk about a block before falling, due to the neuropathy in her feet, and that she most recently fell the day before. *Id.* Claimant testified that she can sit for thirty to forty minutes before becoming stiff. R. 577. At that point, she does exercises for about five minutes or lies down until she feels better. *Id.* Claimant stated that she has trouble using her hands, but she can dress herself, brush her teeth, use the toilet, shower, feed herself, and do the dishes. R. 578-79; 589. Claimant stated that she no longer does any of her former activities, but that she occasionally goes to church with her daughter when her daughter visits from Virginia. R. 580-81. Claimant flew to Virginia to visit with her daughter and grandson about four months prior to the hearing. R. 549.

## 2. Dr. Sheldon Slodki – Medical Expert ("ME")

Dr. Sheldon Slodki, an internist, testified as a medical expert. R. 593. The ME stated that Claimant's complaints of numbness and tingling, decreased grip, and wobbly gait are consistent with the "so-called peripheral neuropathy" that Claimant's podiatrist mentions in the

4

record. R. 595. The ME also stated that Claimant's blurry vision may be related to high blood sugar, Claimant's panic attacks may be related to low blood sugar, and Claimant's headaches may be related to fluctuations in blood sugar. R. 600-01.

The ME further noted evidence of gout in the record. R. 594. Based on Claimant's medication and complaints, the ME described Claimant's other impairments as arthritis, asthma, hiatal hernia, high blood pressure, headache, hypertension, obesity, and increased cholesterol. R. 594-95. The ME stated that based on the record and Claimant's testimony, he does not believe Claimant meets the severity listing levels for the impairments. R. 596.

The ME opined that Claimant would be able to do "sedentary work with certain limits." R. 597. The ME noted that the additional limitations were "based on [Claimant's] testimony and some of the complaints that she has." *Id.* The ME identified additional limitations in fine and gross manipulation and walking. *Id.* The ME stated that he generally agreed with Dr. Elmes's residual functional capacity ("RFC") evaluation, with the additional limitations included. R. 599.

The ME clarified that all of his considerations were based on stable diabetic control, but based on Claimant's testimony and "certain of the things that she's mentioned in terms of her recordings of the blood sugars being all over the place," he does not believe Claimant is in good control. R. 598. The ME opined that Claimant should be managed by an endocrinologist. R. 600.

### 3. Michelle Peters – Vocational Expert ("VE")

Michelle Peters testified as a vocational expert. R. 602. The VE described Claimant's past work as a dental assistant and oral surgery assistant, which she categorized as skilled and light. R. 602. The VE further described a secretarial position, which she categorized as semi-

5

skilled and sedentary. R. 602-03. The ALJ asked the VE whether a person 50 years old or younger, with Claimant's education and past work experience, limited to light work with no repetitive pushing, pulling, or climbing, and occasional stooping, kneeling, crouching, or crawling, could perform Claimant's past relevant work. R. 603-04. The VE responded affirmatively. R. 604. The ALJ proposed the same scenario but limited the hypothetical person to sedentary work, and the VE again responded affirmatively. *Id.* The VE then testified that if the hypothetical person were limited to repetitive, unskilled work, it would eliminate all past relevant work, but identified other jobs in the Chicago metro area that the person would be able to perform. R. 605. The ALJ asked the VE whether those positions would be available if the hypothetical person wished to stand in place for two or three minutes at a time after a continuous period of 60 minutes. R. 606. The VE responded that the number of positions would decrease by approximately 25 percent. *Id.* The VE testified that if the hypothetical person wished to stand or sit at will, the number of available positions would decrease by 50 percent. R. 607. Upon cross-examination by Claimant's attorney, the VE testified that all work would be eliminated if the hypothetical person needed to get up and do exercises for five minutes after sitting for a period of thirty to forty minutes. R. 609.

## C.    Medical Evidence

### 1.    Advocate Health Centers – Claimant's Treating Physicians

Claimant received most of her treatment from Advocate Health Centers. Claimant's primary documented complaints are diabetes mellitus ("DM"); knee, back, thumb, and toe pain; asthma; and high blood pressure. Claimant also sought treatment for other various issues, including eczema, spider bites, respiratory infections, and prescription refills.

6

On August 7, 2001, Claimant's doctor noted "uncontrolled DM" on a progress report and adjusted Claimant's medications. R. 252. On February 28, 2003, Claimant was again treated for uncontrolled diabetes, with a markedly high blood sugar reading. She was described as noncompliant with the recommended diet. The doctor adjusted her medications and asked her to return for a follow-up visit. At Claimant's follow-up visit on March 1, 2003, her blood sugar was again markedly elevated. Claimant was prescribed insulin and was educated on its use. When Claimant returned to the clinic on March 12, 2003, she reported that her home blood sugar readings had improved and that she felt better. R. 306-09. Claimant's diabetic condition was described as in "good to fair control" on September 29, 2004, and again on October 27, 2004. R. 362, 354. On May 5, 2005, Claimant was described as in "excellent control" of her diabetes. R. 419. On June 8, 2006, Claimant reported low home blood sugar readings to her doctor. The doctor adjusted her medication. R. 430-31. Claimant reported high home blood sugar readings in August, 2006, and also complained of mild tingling in her feet and blurry vision. She was given IV insulin, and her medications were adjusted. In September 2006, Claimant still reported high home blood sugar readings. Claimant's doctor again adjusted her insulin. R. 433-38.

Claimant first complained of right knee pain on September 27, 2004. Claimant had x-rays taken of her knees which came back negative. R. 364-65. On October 26, 2004, Claimant again complained of knee pain, but on November 17, she reported that her knees felt "better" and that her back felt "fine." R. 359, 409. Claimant complained of back and knee pain on May 2, 2005, and again on May 13, 2005. Claimant had x-rays of her knee and back. The back x-ray was normal and the knee x-ray showed only mild degenerative changed. R. 415.

On March 3, 2005, Claimant reported thumb pain. The x-ray showed a small fracture, for which Claimant was given a splint. R. 411, 423.

7

Claimant complained of pain and swelling in her left little toe on June 26, 2005. R. 418. She was referred to Dr. Adam Fleischer, a podiatrist. At Claimant's first visit with Dr. Fleischer on June 30, he advised her to wear a surgical shoe. At her follow-up visit on July 21, Dr. Fleischer found Claimant to be doing well following her injury, and advised her that she could transition to a normal shoe when she felt ready. Dr. Fleischer noted that Claimant lacked "protective sensation" in her feet and diagnosed her with peripheral neuropathy. R. 424-427.

On December 1, 2001, Claimant complained of wheezing. She received nebulizer treatment and was discharged with medications. Claimant also complained of wheezing in December 2003 and March 2005, but on August 31, 2006, she reported that her asthma was stable and that she had not needed to use her inhaler recently. R. 371, 413, 436. At Claimant's last documented Advocate visit, she again complained of asthma symptoms. She was diagnosed with a respiratory infection and prescribed medication. R. 439.

The Advocate records show a history of high blood pressure. On November 30, 2002, Claimant's blood pressure was markedly elevated at 189/105. She was advised to follow up with her primary physician for a blood pressure check. At her December 4 follow-up, Claimant's blood pressure was still elevated, but it had improved from her previous appointment. R. 310-11. Claimant's blood pressure was still elevated in March and April, 2005, and she was advised to lose weight and reduce her alcohol use. R. 413-14. However, on February 23, 2006, Claimant's blood pressure was well-controlled at 122/80. R. 428. On September 12, 2006, Claimant's blood pressure was again elevated at 164/104. R. 437.

### 2. Provident Hospital

Claimant sought and received refills of her routine medications at the Provident Hospital ER in August and September, 2003. R. 379-384.

8

On March 5, 2005, Claimant returned to Provident Hospital, reporting that she injured her thumb on February 6, 2005. X-rays were negative. Claimant was diagnosed with arthritis in the right thumb, prescribed Motrin, and told to follow up with an orthopedist. R. 388-393. Claimant returned on May 11, 2005, complaining of severe pain in her back, shoulder, knee, and ankle. Claimant reported that the pain began one week earlier, after a head on motor vehicle collision. The doctor diagnosed acute back pain/strain and advised Claimant to refrain from lifting, to use a moist heat pad, and to follow up with her primary physician. Claimant was prescribed Naprosyn and Valium for pain. R. 403-408.

Claimant was treated for spider bites at Provident Hospital on September 6, 2006. The examining ER physician noted that Claimant had normal strength in all upper and lower extremities, and no loss of sensation. R. 394-402.

### 3. Dr. Mahendragouda Patil – State Examining Physician

Claimant had a consultative examination on June 19, 2002. Claimant reported a history of treatment for asthma, hypertension, and diabetes, and complained of numbness, aching, and burning in her fingers and feet. Claimant's blood pressure was elevated at 150/96. She had slightly reduced uncorrected visual acuity and slightly abnormal chest sounds, but the other physical examination findings were essentially normal. The doctor described Claimant as "anxious," but the mini-mental status examination findings were otherwise normal. Claimant's gait, ambulation, and bilateral manual dexterity were also normal. R. 270-274.

### 4. Dr. James Elmes – Residual Functional Capacity ("RFC") Assessment

Dr. James Elmes, an orthopedic specialist, examined Claimant on December 22, 2004. Claimant complained primarily of pain in her low back and right knee. Claimant stated that she was taking prescribed medications for DM, hypertension, high cholesterol and asthma, and over

9

the counter strength Tylenol for pain. Her blood pressure was slightly elevated and she had reduced uncorrected visual acuity in the right eye. Claimant's gait was normal but she complained of pain when walking or squatting. She had normal bilateral manual dexterity, but slightly decreased grip strength in the non-dominant left hand due to complains of pain in the left index finger. She also had reduced lower extremity strength due to back and knee pain. Claimant had decreased sensation to vibration in the left upper and lower extremity and decreased sensation to light touch but not to pinprick in the right foot. The reflexes were equal bilaterally. Claimant had slightly reduced range of motion of the knees and back.

Dr. Elmes completed an RFC opinion form after examining Claimant. He opined that Claimant can perform close to the full range of sedentary work. He opined that she can lift less than 10 pounds frequently, can stand and/or walk for a total of two hours in a workday, and can sit throughout a workday, with periodic opportunity to stand. He opined that she should never climb ladders, ropes or scaffolds, kneel, crouch or crawl, and that she should only occasionally work on moving or unstable surfaces. He opined that she is limited in the ability to lift or reach in all directions, including overhead; that she has reduced visual acuity; and that she should avoid work that would expose her to extremes of temperature, humidity, vibration, unprotected heights, or unguarded hazardous equipment. R. 337-348.

### 5.     Miscellaneous Treatment Records

Claimant was admitted to Little Company of Mary Hospital on February 2, 2002 for alcohol detoxification. She was detoxed successfully and was discharged on February 8. R. 257-269.

Claimant was admitted to Jackson Park Hospital on August 30, 2002 for treatment of uncontrolled DM. Claimant also complained of severe headaches. She was discharged on September 1. R. 284-305.

Claimant went to the University of Chicago ER on September 3, 2002, reporting elevated blood sugar and blurry vision. She was diagnosed with poorly controlled DM, given medication in the ER, and told to follow up at the internal medicine clinic. R. 328-335.

Claimant had an esophagogastroduodenoscopy at Trinity Hospital on September 27, 2003, that showed a hiatal hernia. R. 336. On October 23, Claimant reported to her primary physician that she was diagnosed with gastric reflux disease and given a prescription for Prevacid. R. 372.

## D.    The ALJ's Decision – May 25, 2007

After a hearing and review of the medical evidence, the ALJ determined that Claimant was not disabled from her alleged onset date of August 1, 2001, but became disabled on February 6, 2007 by direct application of Medical-Vocational Rule 201.14. R. 18-45. The ALJ reviewed Claimant's application under the required five-step sequential evaluation process. R. 19-44. At step one, the ALJ found Claimant had not engaged in substantial gainful activity since August 1, 2001, the alleged onset date. R. 21. At step two, the ALJ found Claimant had the severe impairments of DM, hypertension, arthritis, asthma, and a history of alcohol dependence. *Id.* At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404.1520(d). R. 22. The ALJ then considered Claimant's RFC[1] and found Claimant capable of

---

[1] The RFC is the most that a claimant can do despite the effects of her impairments. 20 C.F.R. 404.1545(a).

performing "sedentary" work,[2] and further noted that, based on the record as a whole, Claimant might prefer to stand in place for about two minutes after a continuous period seated of 60 minutes or longer. R. 25, 33.

In assessing Claimant's RFC, the ALJ considered all of Claimant's symptoms and the extent to which the symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529. R. 25. The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527. *Id.* The ALJ provided a detailed description of Claimant's medical records, medical source statements, symptoms, daily activities, and credibility. R. 25-41. The ALJ noted that although Claimant had a long-term treatment relationship with her primary physicians at the Advocate clinic, Claimant did not submit physical or mental RFC opinion forms. R. 32. Thus, at Claimant's first hearing, the ALJ adopted the RFC opinion of Dr. Elmes, the state's orthopedic specialist. *Id.* The ALJ noted Dr. Elmes's expertise and recent examination of Claimant and her records. *Id.* The ALJ further found Dr. Elmes's opinion to be consistent with and supported by the objective medical and other evidence. *Id.* The ALJ noted that Dr. Slodki, the ME, opined that Claimant had the RFC to perform sedentary work, and that his opinion is generally consistent with and supported by Dr. Elmes's opinion. R. 33.

The ALJ did not give full credit to Claimant's testimony because "the objective medical evidence does not document the kind of musculoskeletal or severe neurological impairments that would be expected to cause the nature and severity of symptoms claimant describe[d]." R. 40.

---

[2] Sedentary work is defined as lifting no more than 10 pounds at a time and occasionally carrying articles such as docket files, ledgers, and small tools, with "a certain amount of walking and standing" occasionally required. 20 C.F.R. 404.1567(a).

Specifically, the ALJ noted that while Claimant sought out treatment on numerous occasions for relatively minor complaints, she failed to mention most of her reported complaints to physicians. *Id.* Claimant also admitted to running out of her prescriptions. *Id.* Furthermore, the ALJ found that Claimant's description of her daily activities suggests much better ability to function than would be expected if she were suffering with the types of symptoms she described. *Id.* The ALJ explained that while Claimant's activities in isolation would not preclude a finding of disability prior to Claimant's 50th birthday, the record as a whole suggests that Claimant did not and does not suffer from the subjective symptoms she testified to. R. 41.

At step four, the ALJ concluded Claimant was unable to perform any past relevant work. *Id.* At step five, the ALJ found that prior to February 6, 2007, there were a significant number of jobs in the national economy that Claimant could perform. R. 42. However, beginning on February 6, 2007, there were not a significant number of jobs in the national economy that Claimant could perform. R. 44. Thus, the ALJ concluded that Claimant became disabled under the Social Security Act on February 6, 2007. *Id.*

## II. LEGAL STANDARD

### A. Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel,* 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching her decision. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.    Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under

14

a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: 1) whether the claimant is engaged in substantial gainful activity; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment meets or equals a listed impairment; 4) whether the claimant can perform past relevant work; and 5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

Claimant raises the following issues in support of her motion: 1) whether the ALJ improperly disregarded the testimony of the ME regarding Claimant's uncontrolled diabetes and its consequences; 2) whether the ALJ's hypothetical questions to the VE were improperly based on an unsupported stand/sit option and did not include all of Claimant's limitations; and 3) whether the ALJ erred in discounting Claimant's credibility.

### A. The ALJ Reasonably Weighed the Various Medical Opinions and Evidence.

Claimant complains that the ALJ failed to consider and discuss the ME's testimony, and that the ME's testimony supports a finding that Claimant was disabled since her alleged onset date. In particular, Claimant argues that the ALJ should have considered the ME's testimony that Claimant's diabetes was uncontrolled and his testimony regarding the consequences of that

condition. When assessing conflicting medical evidence, it is the ALJ's responsibility to decide which doctor to credit. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The ALJ assesses a medical opinion based on a number of factors, including: the length and frequency of the treatment relationship, the nature and extent of the treatment relationship, relevant evidence to support the opinion, and the opinion's consistency with the record as a whole. 20 C.F.R. 404.1527(d)(2-4). The ALJ will generally give more weight to the opinion of an examining source than to the opinion of a nonexamining source. 20 C.F.R. 404.1527(d)(1). Because nonexamining sources have no examining or treatment relationship with a claimant, the weight given to their opinions depends on the degree to which they provide explanations for those opinions. 20 C.F.R. 404.1527(d)(3). A medical expert is a nonexamining source. Thus, while the regulations require an ALJ to consider medical experts' opinions, the ALJ is not bound by them. 20 C.F.R. 404.1527(f)(2)(i).

Here, it is well within the ALJ's discretion to discount the ME's opinion regarding Claimant's diabetic condition. There is substantial evidence in the record from Claimant's primary treating physicians at Advocate to indicate that Claimant's diabetes was controlled. For example, the ALJ points to medical records in which Claimant's doctors at Advocate describe Claimant's diabetes as "well-controlled." R. 27-29. The ALJ further discusses medical evidence in which Claimant's blood sugar readings have been abnormal, but are much improved with the proper medication. R. 25, 27. On the contrary, the ME's opinion that Claimant's diabetes is uncontrolled is based on "certain of the things that [Claimant] mentioned in terms of her recordings of the blood sugars being all over the place." R. 598. Medical opinions upon which an ALJ should rely need to be based on objective observations, not a recitation of a claimant's subjective complaints. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). The

16

ME's opinion regarding Claimant's diabetes is based on Claimant's own testimony, which the ALJ determined was not fully credible. Thus, the ALJ did not err in disregarding the nonexamining ME's opinion, while instead relying on contradictory objective evidence from Claimant's treating physicians.

Claimant further argues that even if the ALJ was entitled to disregard the ME's testimony, she failed to justify rejecting the portions of the ME's testimony that went beyond the objective medical record. While the ALJ cannot discount medical opinions without an explanation, *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994), neither must she provide a "complete written evaluation of every piece of testimony and evidence." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Rather, a decision will be upheld when an ALJ "articulate[s], at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Id.* at 307. This is not a case where the ALJ discounted an entire line of evidence. Here, the ALJ clearly considered the ME's opinion: she discusses the ME's testimony in terms of both the impairment listings and Claimant's RFC. R. 23-24, 33. The ALJ makes it clear, though, that she relied on objective evidence to render her decision. For example, when determining whether Claimant met or medically equaled a listing, the ALJ considered the ME's testimony that was based on the "objective medical evidence of claimant's impairments." R. 23. In determining Claimant's RFC, the ALJ explains that she relied on "objective medical evidence." R. 25. Specifically, the ALJ explains that she adopted the RFC opinion of Dr. Elmes because she "found his opinion to be consistent with and supported by the objective medical and other evidence." R. 32. The ALJ states at various other times throughout the decision that she relied on the objective evidence in reaching her conclusions. R. 23, 33. The ALJ explicitly discusses why Claimant's testimony is not fully credible. R. 37, 40-41. It is well within the

17

ALJ's discretion to use the credibility determination to decide how much weight to give each piece of evidence. Therefore, the ALJ built the requisite logical bridge to show which medical opinions she credited and why.

Claimant also complains that the ALJ's disregard for portions of the ME's testimony is inconsistent with her acceptance of other portions of the testimony. Although Claimant argues that this inconsistency requires remand, "the ALJ is entitled to accept any part of an expert's testimony or reject it completely." *Glass v. Astrue*, 263 F. App'x. 526, 529 (7th Cir. 2008) (*citing Bunge Corp. v. Carlisle*, 227 F.3d 934, 940 (7th Cir. 2000)).

**B.    The ALJ Properly Considered Claimant's Impairments in Formulating Claimant's RFC and Hypothetical Questions for the Vocational Expert.**

**1.    The ALJ's Stand/Sit Option Was Not Improper.**

Claimant argues that the ALJ improperly formulated a stand/sit option in which Claimant might prefer to stand in place for about two minutes after a continuous period seated of 60 minutes or longer. An ALJ cannot "play doctor" and make her own medical findings. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Determinations must be based on testimony and medical evidence in the record. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 702 (7th Cir. 2009). The ALJ adopted Dr. Elmes's RFC opinion, which notes that Claimant must periodically alternate between standing and sitting to relieve pain or discomfort. R. 345. No doctor suggested that Claimant needed to alternate more frequently than once an hour. The ALJ's stand/sit option has support in the record and is not unreasonable.

Even if the ALJ's stand/sit option was unreasonable, the error would be harmless. "[I]n administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision." *Sanchez ex rel. Sanchez v. Barnhart*, 467 F.3d

1081, 1082-83 (7th Cir. 2006). The ALJ asked the VE whether a significant number of jobs existed in the national economy for a hypothetical person with Claimant's age, experience, education, and limitations if 1) the hypothetical person needed to stand in place for two or three minutes after a continuous period of 60 minutes or longer; and 2) if the hypothetical person was permitted to stand or sit at will. R. 606. The VE testified that for both scenarios, a significant number of jobs existed. R. 606-07. Thus, even if the ALJ underestimated Claimant's need to alternate between standing and sitting, Claimant would still be able to work. Claimant relies on the cross-examination of the VE, in which the VE stated that all work would be eliminated if the hypothetical person would have to get up and do exercises for five minutes after sitting for a period of thirty to forty minutes. R. 609. However, there is no evidence in the record that Claimant would require such accommodations. The only mention of this limitation comes from Claimant's own testimony, which the ALJ found to be less than completely credible. R. 577. Dr. Elmes's report specifically mentions periodically alternating between standing and sitting and does not include an observation that Claimant would have to do five minutes of exercises.

### 2. The ALJ Properly Excluded Non-Credible Limitations in the Hypothetical Questions for the Vocational Expert.

Claimant argues that the ALJ did not factor her frequent absences and limitations in gross and fine manipulation into the hypothetical questions proposed to the VE. Hypothetical questions to the VE must include all limitations supported by medical evidence in the record. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). However, the additional limitations that Claimant argues were left out of the hypothetical questions are based on Claimant's own subjective complaints, not objective evidence from the record. The ALJ found Claimant's testimony to be non-credible. Claimant contends that the ME's testimony provides medical

19

support for her assertions, specifically limitations in gross and fine manipulation. Yet the ME stated that "the limitations [Claimant] has testified to are that there is some limitation of fine and gross with the hand neuropathy." R. 597. Thus, the ME's testimony also is based on Claimant's subjective complaints and does not provide objective evidence to support Claimant's argument. In fact, the medical evidence in the record, specifically Dr. Elmes's examining report, specifically notes that Claimant is "unlimited" in "handling, fingering, and feeling." R. 342. Given that the manipulative limitations are not supported by objective evidence, the ALJ did not err in excluding those limitations in her hypothetical questions to the VE.

Claimant also contends that the ALJ did not factor frequent absences into the hypothetical questions to the VE. Yet Claimant's evidentiary support for frequent absences lies in Claimant's testimony and the ME's testimony based on Claimant's subjective reports. R. 486, 509, 513, 518, 570, 572-73, 576-77, 593. Again, the limitations are not supported by medical evidence in the record, and the ALJ did not err in excluding frequent absences from her hypothetical questions to the VE.

## C.   The ALJ Did Not Err in Discounting Claimant's Credibility.

When faced with a claimant alleging subjective symptoms, an ALJ evaluates the credibility of a claimant's testimony about her symptoms. SSR 96-7p. The ALJ must consider the testimony in light of the entire record and be "sufficiently specific" as to the reasons for her credibility determination. *Id.* That said, the ALJ is in the best position to observe witnesses, and her credibility finding will not be overturned as long as it has some support in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001). An ALJ's credibility determination will be reversed only if the claimant can show it was "patently wrong." *Herr v. Sullivan*, 912 F.2d 178, 182 (7th Cir. 1990). A discrepancy between the reported complaints and the medical

evidence is probative that a witness may be exaggerating her condition. *Powers v. Apfel*, 207
F.3d 431, 435-36 (7th Cir. 2000).

"Applicants for disability benefits have an incentive to exaggerate their symptoms, and
an administrative law judge is free to discount the applicant's testimony on the basis of other
evidence in the case." *Johnson v. Barnhart*, 449 F.3d 431, 435-36 (7th Cir. 2000). Here, the
ALJ gave a highly detailed analysis of the record, including Claimant's treatment history from
before the alleged onset date through less than three months before the hearing. R. 25-32. The
ALJ notes that "the objective medical evidence does not document the kind of musculoskeletal
or severe neurological impairments that would be expected to cause the nature and severity of
symptoms claimant described at both hearings." R. 40. The ALJ specifically points out that
while Claimant sought treatment for relatively minor complaints, including respiratory infections
and minor traumas, Claimant could not explain why she failed on so many opportunities to
mention most of her reported complaints to her treating and examining physicians. *Id.* The ALJ
also points out that Claimant did not take advantage of all of the referrals to specialists offered to
her by her primary physicians. *Id.* Furthermore, the ALJ explains that Claimant's description of
her daily activities, including household chores, cooking, washing dishes, and traveling to
Virginia, suggest a much better ability to function than would be expected based on Claimant's
subjective complaints. R. 40-41.

The ALJ's credibility finding has support in the record and is not "patently wrong."
Claimant argues that the ME's testimony endorses her credibility and that the ALJ based her
credibility finding on the incorrect assumption that Claimant's diabetes was controlled.
However, as noted above, the portions of the ME's testimony that would endorse Claimant's
credibility and suggest that Claimant's diabetes was uncontrolled are based on Claimant's

subjective complaints. Claimant is essentially arguing that her testimony becomes credible due to medical expert testimony that itself is based on her own non-credible testimony. This reasoning is flawed. As previously discussed, the ALJ did not err in discounting the ME's opinions that were based on Claimant's subjective complaints, including the opinion that her diabetes was uncontrolled. Therefore, the ALJ did not err in rejecting Claimant's credibility.

## IV. CONCLUSION

For the reasons set forth in the Court's Memorandum Opinion and Order, Claimant Joan P. Osborn's motion for summary judgment is denied [20], and the Commissioner's cross-motion for summary judgment is granted [26]. This is a final appealable order.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: July 12, 2010